Keystone Northeast v. Keystone Retaining Wall Systems, and this is a dispute between two corporations, and the affilees have chosen not to have counsel despite our advice otherwise. And so we'll proceed today, Mr. Joyce, with you, and we'll take the other side, not by default, but on the briefs. In other words, you don't win by default. You still have to But we don't expect you to have any rebuttal. I was going to say, we rebuttaled when I checked in, Your Honor. Paul Joyce for the appellant, Keystone Retaining Wall Systems. I have Thomas Vanderblom, who's my co-counsel in this case. Can we somehow get a shorthand between these companies? I've just referred to them as Northeast and Keystone, but as two separate entities. Sure, I can do it that way. Same name, but just something to keep it distinct. Yeah, I'll refer to my client as Keystone. Fine. Since we were the original, I referred to the other one as either Pavers or Plaintiff, but I can refer to them as Northeast. Northeast is good. If you prefer. So the relationship between these two companies was quite long, and the dispute that we have is a termination of a license agreement. The license agreement was for the manufacture, marketing, and sale of concrete retaining wall, segmental block retaining wall products. So not what you buy at Lowe's or Home Depot, large 80-pound blocks that are Keystone designed a system that you can take these things and build retaining walls up to 80 feet high, and they secure the land behind them. With an interlock? Yes, and they tie back into the land, so they're very secure. So because of the type of system that it is, Keystone, who developed all the IP and is they'd have to have them in various spots because the exclusive nature of the agreement, the license agreement, is for the manufacturing. These blocks are very heavy, so you have to have different licensees in various territories. The Northeast was a little bit different in that they did not manufacture their own block. So what they did was they went and found subcontractors to go and manufacture. They had one in Maine, they had one in central Massachusetts in Worcester, and they had one in Cape Cod in Wareham. In about 2000, the relationships between Northeast and these other manufacturers started to get sour. They had a hard time working with Northeast, and what they did is they went to Keystone, and they said, we are going to go find another product to sell. We're going to compete with you because we can't deal with Northeast anymore. They're just too difficult. So with that, we said, well, we can't lose these manufacturers because that's where we're selling our product in this major population center in the Northeast. So we entered into an arrangement where Northeast transferred back some of the territory and changed the agreement, the license agreement, to amend, to recognize that the territory was transferred back and allowed these three entities to then enter into direct licenses. It is Keystone's position that the first transfer, which was with a company called Gagney up in Maine, that included a right of first refusal. At the time, Northeast had Maine, eastern Massachusetts, and that was it. So Gagney says, I want to leave. I can't work with this fellow anymore. I need to enter into a direct license agreement with you or I'm going to go compete against you. We said, okay, we will transfer that territory back to us. We'll include all sorts of other things. You had the right of first refusal in there. You had a recognition that the other two entities, Highway and Jandrus, they might go with a direct license. You had an additional three years on the license agreement term. You had increases in the quotas for Northeast. So you had Northeast, which was required to have, I think at the time, 250,000 square feet in sales. They got the advantage of the sales made by Gagney. They got later on the advantage of the sales made by Jandrus and Highway. So with that is the right of first refusal. That right of first refusal was very straightforward. It was two lines. It said, get an offer. You have to match $12,500 and 75,000 square feet to your quota. So Western Massachusetts becomes open as a territory in 1999. In 2000, we enter into the transfer agreement that allows Gagney to take over the state of Maine. The right of first refusal is put in place, and Northeast gains additional territory. They get the states of Vermont and New Hampshire, and Rhode Island, I'm sorry, Vermont and Rhode Island. So Northeast gains more territory, gets the advantage of someone else making the product, and gets a royalty stream for the product sold by that entity. And the numbers sold go to their own quota. So in July of 2000, a letter is sent to Northeast, and it says, you are going to waive $12,500 worth of fees if Jandrus gets their own territory, enters into its own transfer agreement. Well, in October 2000, Jandrus does. So we look at the totality of the circumstances and say, okay, you've got a non-manufacturing entity here, Northeast, that is out marketing, is having real problems with their manufacturers, and again, the exclusive nature of the license agreement is the manufacturing. Because of that, they enter into the Jandrus agreement. And they get Western Massachusetts in one paragraph, and the next paragraph, they give it away. It goes, you know, they get Western Mass, that and more territory goes back to Keystone. Northeast pays the $12,500. Jandrus takes over that territory. Everything moves on. Same thing happens for Highway, except Highway was just one town in Cape Cod. That was their agreement. So up until that time, that's 2000, everything keeps going. The quotas were met easily. This wasn't an issue. Do you mind if I interrupt for just one quick question? Sure. What is the status of the outstanding judgment in this case? It's been bonded. It's been bonded. Okay. Sorry to interrupt. The district court put right in the judgment that we could bond it and actually has that monies going forward is being put into an escrow account for the current royalties. That's all being held, so bond and escrow. So everything goes fine up until 2008. In 2008, we have a problem in the country with the recession. Construction really has a real problem. The boom is over with. Everyone is trying to hold on to their facilities. It hurts our business significantly. So the quotas that were being met pretty easily by Northeast, principally because they had Highway, Janderson, Gagney selling our product and they were getting credit for that, all of a sudden go below. And there's a dispute, which is why it was before the district court, as to if the right of first refusal was actually exercised. It is our opinion that when you look at the total facts in the situation, it had to be exercised. There was no other reasonable explanation for giving them that territory, getting the $12,500 unless the increase of the quota goes up. There's no question that the Northeast, even with the credits from Highway, Janderson, Gagney, did not meet 575,000 square feet of sales. It was somewhere in the 537,000 range. So with that, we attempted to work with the three manufacturers, Highway, Janderson, Gagney. We had calls with them. We said, okay, they have a problem. They came up with a plan. This is what we're going to do to increase our sales. This is what we're going to do to get it back. The plaintiff had already basically checked out of the license agreement. They had moved to South Carolina years before. They had not even been to the territory in two years. They had no salespeople. They had no sales in 2007 and 2008. They did not have a plan as to how to increase sales, and they took the position that they had a perpetual agreement that could not be terminated, so they didn't have to do anything. All they had to do was collect their check. We obviously believed that they had not. They had an ongoing obligation to market, aggressively sell, and manufacture our product. They gave up on that. Because of that, they didn't meet their quota, and with them not meeting the quota, we terminated them. Three years later, the plaintiff, or I'm sorry, Northeast, brought a lawsuit after a couple changes of attorneys. We have a trial before the – we go and pick a jury before Judge Hendricks. We had filed cross motions for summary judgment. Judge Hendricks granted, at first, our argument that we could terminate the transfer agreements because they were part and parcel with the license agreement. Later on, but she also ruled that the money kept on going forward. I'm sorry, what did you say? She also ruled that the plaintiff – or that, I'm sorry, Northeast was entitled to a certain sum of money because the termination was not proper. We filed a motion to reconsider. On the motion to reconsider, Judge Hendricks changed her position but ended up with the same result. Basically, what she said was the license agreement did have an end point because there was a renewal that went through 2010. And there was an – it didn't just automatically renew. It wasn't an evergreen agreement. You had to come to an agreement as to what the new quotas would be. There was no agreement as to what the new quotas would be, so it had to end by at least that date. But she also said the transfer agreements were no longer integrated in with the license agreement. And that's really what the key issue is here. It is Keystone's position that the transfer agreements – if they are integrated, then what happens? You're only responsible for the two years up to 2010? If we are correct and they are integrated, then – and we also did not terminate properly in 2008 because say that the number was 500,000 square feet, not 575. Yes, then we would be liable up to 2010. All right, supporting your position, and I don't want to make your arguments for you, but this is a little bit of a strange adversarial proceeding, so to speak. But I'm looking at JA-448, and this is the renewal in 2005. And it says agreements. The license agreement as amended by the transfer agreements is hereby renewed through December 2010. That seems to link them pretty closely. It seems to me the transfer agreements make no sense without the license agreement. It looks like it's explicitly signed there both by Northeast and Keystone. I couldn't agree with you more, Your Honor. Well, I would think you would. What would the other side say to that? I mean, we can't have all five of – all four of us be on one side. Right? Well, fine. Well, there is a possibility the court could just go to them the whole way, or even right here, and the court would pick an attorney and appoint it to the other side. Well, Judge Traxler was going to get Mr. Vanderbloom to argue on behalf of Keystone, but I asked not to. The other side would say they are separate and distinct agreements, and they go on their own. They initially took the position that the transfer – No, I know they say that. But what was the rationale for that position? The rationale for that was that basically the transfer agreements went for so long as they had an agreement that Keystone had licenses with Highway, Jandrus, and Gagney. They don't have any evidence or documents that say that, but they just said that's the way the parties acted. That Keystone always got – that the Northeast always got paid as long as we had the relationship, the license agreements with Highway, Jandrus, and Gagney. The transfer agreement doesn't make any sense in the absence of an underlying license agreement because the transfer agreement is a return of territory that was originally granted under the license agreement. Yes. Is that a correct understanding? Yes, because you could only transfer what you had, and all they had was the right to manufacture and market the product in that territory. And if the underlying license agreement ended legitimately or not, in this case, the Court found it did because you had to have new terms to renew it. There was no new terms were agreed to after December 2010. If it came to an end, then there was no territory to cede back to anybody. Correct. You don't need to belabor that one. So what would remain in the way of disputed facts, or do you contend that your client's entitled to judgment as a matter of law? I do think that when you look under the totality of the circumstances, the right of first refusal was exercised. And if the right of first refusal was exercised, we had an absolute right to terminate that license agreement. And is your argument that the right was exercised as a matter of law on this record it was exercised, or is your argument that it's a jury question? No. Was there a jury prayer in this case? Yes, there was, Your Honor. Okay. So which is your argument? Not that it couldn't be both, but which do you press? As a matter of law. As a matter of law. We filed a motion for summary judgment that the right of first refusal had, that we had met the requirements for the right of first refusal, that the quota was $575,000, and that they did not meet us. So do you agree, then, that there is no dispute of fact one way or the other? It's either yes or no as a matter of law? Yes, Your Honor. And I believe that there's no dispute of fact as to the term of the agreement. So the issue that I think is being pressed here is that the right of first refusal was exercised. And there's nothing explicit that says that except for John Schramm's affidavit. He does say it, and the district court discounted that. I don't know quite how. But the question that Judge Davis, I think, is pressing is, do you win or lose as a matter of law, or is there a middle ground that there is a question of fact on whether the right of first refusal was exercised? No, Your Honor. I think that we win as a matter of law. Because if you look at the totality of the circumstances, all the elements are in place. Okay. So the other part of the question is, do you lose as a matter of law? Well, if we — If one disagrees with that position. I would say that we would lose as a matter of law, but we go back to everything ends on December 31, 2010. Oh, okay. I got that. So I would understand if the court rules and says, no, as a matter of law, you did not execute the right of first refusal, or a reasonable jury could not find that, then, okay, it's 2010. You know, the judgment is set up, so there's really nothing else to do. In part, in reverse, in part. In other words, if that was the case. Yes. Is that what you're saying? Yes. Is that right? Yes. Yes. And — Do you have a position somewhere in your array of prayers that calls for a remand based on the fact that the right of first refusal, whether that was exercised, is a question of fact? Well, Your Honor, we did ask that if the court — because the district court read the inferences that on our — when the plaintiff moved for summary judgment, we obviously opposed it. It said the right of first refusal. The court — the district court said, no, I'm not going to look at that at all. I just think it didn't happen. I think that we would get the inference that that could have happened. So I would say, yes, you could remand. But I think — Did you maintain to the district court, here's this evidence and it did happen and there's at least a question of fact? Yes, we did. And do you maintain that argument here? Well, we think that the — I know what you think. You want the whole cake, but — I would love to have the whole cake. I would understand — you know, I think if the court — I think you think that it's up or down on that first issue. Yes. Is that right? Is the easiest way to put it. So either you win on summary judgment or you lose on summary judgment. We lose on summary judgment, but then we win — Let me tell you what troubles me a little bit. And I'm not — this is not necessarily my position, but this is one of the thought processes I've gone through. The record seems to be devoid of any document that says we are exercising our right of first refusal, that a offer was communicated to the auctioneer and — with a proposal, and that the right of first refusal was therefore accepted. It looks like there's nothing explicit that supports that. There is the affidavit of Schramm where he says it was exercised, but he didn't give many details. And the district court sort of pushed that affidavit aside. Maybe he thought — she thought it was too conclusory or what. On the other hand, the $25,000 fee was in fact paid, half by Jan Drist and half by your client. And which suggests — and the western Massachusetts was conveyed as a new territory. But the actual right of first refusal, and that all to me is indirect evidence that maybe you might be right, but it's not totally clear that this just wasn't negotiated anew in some fashion. And so the question might arise there that circumstantial evidence creates a question of fact that should be resolved, whether they actually got together or somebody said we're exercising our right of first refusal. Your Honor, I agree with you. There is no specific letter or document saying, yes, I'm exercising the right of first refusal. Or even a communication of the offer from the third party. I agree. I think that there's — Mr. Morris' testimony says that he conveyed it to everybody, including Dan Albert, who is the — Well, why wouldn't that create a question of fact as opposed to — well, I mean, if you're putting all your eggs in the basket, that if you don't win, you lose, that's a pretty dicey thing to be saying. Unfortunately, Your Honor, I can't — the facts don't show. We don't have that letter. We don't have that correspondence. So I have to go — How can you say you win as a matter of law, then? Because I think, Your Honor, when you look at the — the case law says you look at the totality of the circumstances surrounding the right of first refusal. Minnesota doesn't require a written offer. It doesn't require — it could be an oral offer. It could have been a — they could have been in a hamburger shop and talking about it. But it's not in the record right now. There is the conclusory statement by Schramm. There is the payment of the $25,000. There is also the conveyance of western Massachusetts territory, all consistent with the right of first refusal. But those items could have been also part of a separate agreement as opposed to the right of first refusal, which — and the right of first refusal is important because it raises the quota. Yes, Your Honor, but there is no evidence that there was any other agreement. All right. It's all circumstantial, and that's my whole question. You may be right. I'd like to think about whether the record only gives you, without any dispute of fact, gives you the right of first refusal conclusion. But since there is nothing explicit in there, it has to be circumstantial. And what you're saying, that circumstantial evidence admits of no other conclusion. Yes. Of course, you do have the burden of proof on that question, right? Yes, we do, Your Honor. The Court doesn't have any other questions. All right. Thank you. We'll come down and greet you and welcome you to our Court and proceed on to the next case.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Andre M. Davis